

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

APM TERMINALS VIRGINIA, INC.

        Plaintiff,

v.                                                      Civil Action No. 2:11cv100

SHANGHAI ZHENHUA HEAVY INDUSTRY CO., LTD.
*formerly known as*
SHANGHAI ZHENHUA PORT MACHINERY CO. LTD.,
*in personam*

        Defendants.

## OPINION AND ORDER

This is a contract dispute arising out of Defendant Shanghai Zhenhua Heavy Industries Co., Ltd.'s ("Defendant") alleged breach of a maritime contract under which Defendant agreed to deliver two gantry container cranes to Plaintiff APM Terminals Virginia, Inc.'s ("Plaintiff") terminal in Portsmouth, Virginia by March 1, 2011. During the delivery process, one of the cranes was damaged, which delayed delivery to Plaintiff. This matter is presently before the Court upon Defendant's Motion for Partial Summary Judgment, filed with this Court on June 25, 2012. Defendant seeks to limit Plaintiff's recoverable damages stemming from the late delivery of the crane, if any, to $780,000, the limit provided in the liquidated damages provision in the contract governing the relationship between the parties. For the reasons stated herein, Defendant's Motion is hereby **GRANTED** with respect to Plaintiff's claims relating to delayed delivery damages. The Court also finds that Defendant's Motion to Strike Plaintiff's Surreply is **MOOT**.

1

## I. DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S SURREPLY

By leave of the Court, Plaintiff was permitted to file a Surreply Brief to Defendant's rebuttal brief to Plaintiff's opposition to Defendant's Motion for Summary Judgment. Defendant now moves to strike certain portions of Plaintiff's Surreply on the grounds that Plaintiff introduced new arguments and authority and otherwise exceeded the scope of a proper surreply brief. In deciding Defendant's Motion for Summary Judgment, the Court found no need to consider the contested authority raised in Plaintiff's Surreply Brief. Accordingly, Defendant's Motion to Strike is moot.

## II. FACTUAL HISTORY

According to Plaintiff's Intervenor's Complaint, Plaintiff is a Virginia corporation which owns a terminal located in Portsmouth, Virginia. (Int. Compl. ¶ 2.) Defendant is a Chinese corporation in the business of manufacturing shipping cranes. In 2007, AP-Moeller-Maersk A/S ("APMM") and Defendant[1] entered into a Main Purchase Agreement ("Main Agreement") governing the purchase and delivery of ship-to-shore container handling cranes. APMM and its affiliates then entered into individual purchase contracts with Defendant for specific terminal facilities, with the terms of the Main Agreement governing these various crane purchases.

According to the Complaint, Plaintiff is a subsidiary of APMM. Although Plaintiff originally operated its Portsmouth Terminal itself, in 2010 it entered into a lease whereby it rented that facility to the Virginia Port Authority ("VPA"), an agency and political subdivision of the Commonwealth of Virginia. According to Plaintiff, under the terms of the lease, VPA pays to Plaintiff a monthly rent which varies based on the number of container cranes Plaintiff has available for use at the terminal. (Br. Opp. to Mot. Summary J., 3.) At the time that Plaintiff and VPA entered the lease, Plaintiff had six container cranes available for use. (*Id.*) The Complaint

---

[1] At the time the parties entered this contract, Defendant was known as Shanghai Zhenhua Port Machinery Co., Ltd.

2

indicates that the lease terms provided that VPA's rental payments would increase substantially once the number of working container cranes was increased to eight. (*Id.*) For this reason, Plaintiff entered a contract with Defendant to purchase two additional container cranes. (*Id.*)

Although Plaintiff's contract with Defendant for the purchase of the two additional cranes is governed by the Main Agreement, several additions and changes were made to that agreement. In April 2008, the parties agreed to modify the Main Agreement through an Addendum to that Agreement. In July 2008, APMM subsidiary APM Terminals of North America ("APMNA") signed a Specific Purchase Contract ("Purchase Contract") with Defendant, under which Defendant was to build, deliver, and install four cranes at APMNA's terminal in Los Angeles. (Br. Opp. to Mot. Summ. J., p. 4.) However, in May 2009, due to the economic downturn, APMNA and Defendant entered into a Memorandum of Understanding by which the shipment and delivery of these four cranes would be postponed. (*Id.*) In June 2010, APMM and Defendant further modified the Purchase Contract, agreeing that two of the cranes that were originally supposed to be delivered to the Los Angeles terminal would be modified and delivered to Plaintiff's Portsmouth terminal. In September 2010, APMNA and Defendant modified the Purchase Contract a final time through an Addendum, which assigned the contract to Plaintiff. (*Id.* at 4-5.) Ultimately, the Purchase Contract required Defendant to build, deliver, and install two cranes (Crane #7 and Crane #8) at Plaintiff's Portsmouth terminal, available for use no later than March 1, 2011. (*Id.* at 5.)

According to Plaintiff, in December 2010, Defendant dispatched the Zhen Hua 24 ("the vessel") from China with cargo including Cranes #7 and #8, bound for the Portsmouth terminal. On February 24, 2011, the vessel had offloaded Cranes #7 and #8 and was ready to depart the Portsmouth Terminal en route to her next port. Plaintiff indicates that the vessel still had two

3

large gantry container cranes aboard, which extended some meters beyond the ship's siding. (Br. Opp. to Mot. Summ. J., p. 6.) To assist the Zhen Hua in getting safely away from her berth, her operator retained a docking pilot, Captain John Hanna. Captain Hanna allegedly conducted a pre-departure brief with the Zhen Hua's master in which he stressed the importance of not moving forward out of the ship's berth until he was certain that the cranes on deck would clear Crane #7. (*Id.* at 7.) Ultimately, when the Zhen Hua was pulled away from the dock, her deck came into contact with the end of the boom on Crane #7 onshore, which caused Crane #7 to be dragged off of its tracks onto the wharf and resulted in other damage. (*Id.*)

Plaintiff contends that, beginning in February 2011, the parties worked to restore Crane #7 to working condition. (Br. Opp. to Mot. Summ. J., p. 8.) Plaintiff alleges, however, that these efforts were hindered by unreasonable delays by Defendant. (*Id.*) Crane #7 was not finally delivered to Plaintiff in serviceable condition until February 16, 2012. (*Id.*)

### III. PROCEDURAL HISTORY

This litigation began when Virginia International Terminals ("VIT") and VPA arrested the Zhen Hua 24 ("the vessel"). In their Complaint, VIT and VPA also asserted an *in personam* action against Defendant, alleging that, on its departure out of the APMT terminal in Portsmouth, Virginia, the vessel allided with one of the newly delivered gantry cranes, knocking it into an unauthorized location and causing damage to other areas of the port. Before the vessel departed, Plaintiff APMT moved to intervene in the arrest with its own *in rem* action against the vessel and an *in personam* claim against Defendant for breach of contract. In its Intervening Complaint, Plaintiff alleged that (1) the vessel's negligent operation and allision with the crane caused damage to the wharf and (2) the allision precluded Defendant from delivering the crane by the date specified in the contract, and that late delivery resulted in substantial losses to Plaintiff.

Following negotiations, the parties resolved their differences with respect to VIT/VPA's claims and Count One of Plaintiff APMT's Intervening Complaint. On December 7, 2011, this Court entered an Order dismissing VIT/VPA's Complaint in its entirety and Count One of Plaintiff APMT's Complaint. Thus, the sole remaining claim in this case involves Plaintiff APMT's contract claim for delay damages caused by Defendant's failure to deliver the crane by the date specified in the contract.

Plaintiff contends that, as a result of this delay, it suffered a loss of rent in the amount of $7,832,732.00. Plaintiff also claims that it has had to pay $107,540.03 in fees to the engineering consulting firm which oversaw Defendant's repair efforts and more than $250,000.00 in legal fees. Defendant seeks to limit Plaintiff's recoverable damages to $780,000.00, the cap provided in the liquidated damages clause of the Main Agreement.

### IV. LEGAL STANDARD

Summary judgment is granted only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In reviewing a motion for summary judgment, the Court construes all facts and inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citing *United States v. Diebold, Inc.*, 369 U.S. 564, 655 (1962); *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The moving party bears the initial burden of showing "the absence of an essential element of the nonmoving party's case and that it is entitled to judgment as a matter of law." *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 185 (4th Cir. 2004). Once the moving party satisfies this burden, the nonmoving party then must recite specific facts showing that there

is a genuine dispute of fact which merits a trial. *Id.* (citing *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

V.  **APPLICABLE LAW**

Section 31.1 of the Main Purchase Agreement provides, "This Agreement shall be governed, construed and enforced in accordance with the laws of England to the exclusion of any other law." MPA § 31.1. Based on this plain language, it is clear that the contract is to be interpreted in accord with and governed by English law.

In its Motion for Summary Judgment, Defendant relies heavily on a case from the Seventh Circuit Court of Appeals, *Eastern Elec. Apparatus Repair Co., Inc. v. Jefferson Smurfit Corp.*, 29 F.3d 306 (7th Cir. 1994). Of course, decisions of overseas courts are not binding on English courts. LORD MACKAY OF CLASHFERN, HALSBURY'S LAWS OF ENGLAND (5 Ed., 2009). However, English courts may view as persuasive authority from common law jurisdictions if it is "precisely on point on an issue in respect of which there is no existent English authority." (Pl.'s Ex. 13 to Opp. to Mot. Summ. J., 13.) This Court has reviewed the Seventh Circuit's opinion in *Eastern Electric*. It is unclear from the opinion whether the contract at issue in that case contained an indemnity clause akin to that present in the contract at issue in this case. Absent that information, the Court cannot say that *Eastern Electric* is "precisely on point." Moreover, the contract at issue in this case is a maritime contract. *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 24-25 (2004) (holding that "the true criterion" in determining whether a contract is maritime "is whether it has 'reference to maritime service or maritime transactions,'" and holding that contracts embodying commercial obligations from one port to another are undoubtedly maritime). Therefore, if any foreign law would be persuasive to an English court in resolving this dispute, it would be federal maritime law. *Id.* at 22-23 (federal law controls the

interpretation of maritime contracts). Accordingly, the Court declines to view *Eastern Electric* and other cases decided by United States courts under anything other than federal maritime law as persuasive authority in this case.

## VI. DISCUSSION

The Main Agreement includes a provision entitled "Liquidated damages for delayed Delivery," which provides, in pertinent part:

> If Delivery of the Cranes is later than the delivery date of the Cranes as specified in the Specific Purchase Contract, unless the delay is a consequence of an event under Force Majeure as specified above in this Clause or any other provisions in this Agreement, the Specific Purchase Contract and the Project Summary, the Buyer shall be entitled to claim and the Seller shall pay upon first demand liquidated damages in the amount of 0.5 (zero point five) percent of the Purchase Price for each week that Delivery is delayed, with a maximum of 7.5% (seven and a half percent) of the Purchase Price.
>
> Liquidated damages will be computed by individual Crane, based on the Purchase Price of the Cranes delivered later than the delivery date specified in the Specific Purchase Contract.

MPA §§ 13.8 and 13.10.

The Main Agreement defines "Delivery" to mean that the cranes have been delivered to the specified site, commissioned, and tested in accordance with the conditions set forth in the Conditional Acceptance Clause. MPA §§ 1.1 and 12.1. The Agreement further specified that until such time as the Buyer conditionally accepts the crane, title and ownership in the crane would remain with the Seller (in this case, Defendant). *Id.* at § 12.2.

The parties agree that at the time of the allision giving rise to this litigation, Defendant had not yet delivered the crane and, thus, title and ownership of the crane remained with Defendant. (Def.'s Mem. Supp. Mot. Summ. J., p.6.) There is also no dispute as to the validity and enforceability of the liquidated damages clause contained in the Main Agreement. The sole disagreement between Plaintiff and Defendant is whether liquidated damages are the *exclusive*

7

measure of damages in the event of delayed delivery. To this question, Defendant answers in the affirmative, pointing to the underlying purposes of liquidated damages provisions and the plain language of the liquidated damages clause. Plaintiff, on the other hand, relies on language found elsewhere in the Main Agreement to argue that the liquidated damages provision is a "no-fault" enforcement option available in the event of a delivery delay absent any negligence by Defendant. Specifically, Plaintiff points to subparagraph 13.11 of the Liquidated Damages clause, which provides that, "The Buyer's right to claim liquidated damages is without prejudice to the Seller's obligations and the Buyers other rights as set out in this Agreement." MPA § 13.11. Subparagraph 22.1 further states:

> Defendant "shall be liable for and shall indemnify [Plaintiff] against *any cost, expense, loss, claim, action, suit, proceedings, damages or liability whatsoever* which [Plaintiff] may suffer or incur as a consequence of or arising out of or in connection with:
>
> 22.1.1 Seller's negligence, breach of any of its obligations under the Agreement, the Specific Purchase Contract and the Project Summary . . .
>
> 22.1.2 Any damage to any property (including Buyer's property) . . . caused or in any way attributable to Seller

Both parties agree that proper construction of a contract under English law must give meaning to all provisions of that contract. Thus, where there is a potential conflict between two contractual provisions, the approach of English Courts is to adopt a construction which allows effect to be given to both provisions and to the contract as a whole. SIR KIM LEWISON, THE INTERPRETATION OF CONTRACTS, § 703 (5th ed. 2011); CHITTY ON CONTRACTS, § 12-081 (30th Ed. 2008). Defendant argues that to allow Plaintiff to recover damages greater than those specified in the liquidated damages provision would effectively render the liquidated damages clause meaningless. Plaintiff disputes this, arguing that the liquidated damages provision serves as a cap on damages in all cases of a delivery delay not involving negligence by Defendant.

The Court disagrees with Defendant's contention that Plaintiff's reading of the contract renders the liquidated damages clause meaningless. However, the Court finds that Defendant's reading of the contract more fully effectuates the text and purpose of the liquidated damages clause and comports most closely with the text of the Main Agreement. First, the Main Agreement nowhere distinguishes between the types or causes of delay in the application of the liquidated damages clause. Second, there is no language in the contract that distinguishes delay which is a consequence of the Seller's negligence from that caused by factors outside of the Seller's negligence. Indeed, the only way to give full effect and meaning to the liquidated damages clause (§ 13.8) is to interpret the clause to apply to all delay damages caused by breach of the obligation to deliver the crane by the agreed date, and to interpret the indemnification provision (§ 22.1.1) to apply to all other damages caused by other contractual breaches.

Moreover, Defendant's construction of the contract most fully supports the purpose of liquidated damages clauses, which is to eliminate uncertainty regarding exposure for delay damages by setting a cap on recovery, and also to avoid litigation over damages. Ignoring liquidated damages clause and allowing potential recovery of millions of dollars above that agreed upon in the liquidated damages clause would no doubt undermine the presence of the liquidated damages clause in the contract.

## VII. CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment is hereby **GRANTED** insofar as Defendant's motion is limited to damages pertaining to delivery delay. Plaintiff's potential recovery of damages caused by or resulting from the alleged late delivery of the crane at issue in this case is **LIMITED** to **$780,000.00**. Defendant's Motion to Strike

Plaintiff's Surreply is **MOOT**, as the Court did not rely on any of the contested authority in deciding Defendant's Motion for Summary Judgment.

The Clerk is **DIRECTED** to deliver a copy of this Order to all Counsel of Record.

It is so **ORDERED**.

Newport News, Virginia

August 14, 2012

/s/
Robert G. Doumar
Senior United States District Judge